IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EMERSON ELECTRIC CO., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 17-cv-01846-LPS-JLH |
| | ) | |
| EMERSON QUIET KOOL CO. LTD., and HOME EASY LTD., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| EMERSON RADIO CORP., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | CIVIL ACTION NO. 20-cv-01652-LPS |
| v. | ) | |
| | ) | **REDACTED PUBLIC VERSION** |
| EMERSON QUIET KOOL CO. LTD., and HOME EASY LTD., | ) | |
| | ) | |
| *Defendants.* | ) | |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Dated: July 15, 2021

Of Counsel:

Keith A. Jones (*pro hac vice*)
Panitch Schwarze Belisario & Nadel LLP
Two Commerce Square
2001 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: (215) 965-1330
kjones@panitchlaw.com

**PANITCH SCHWARZE BELISARIO & NADEL, LLP**

By: */s/ John D. Simmons*
    John D. Simmons (Bar No. 5996)
    Dennis J. Butler (Bar No. 5981)
    Wells Fargo Tower
    2200 Concord Pike, Suite 201
    Wilmington, DE 19803
    Telephone: (302) 394-6030
    jsimmons@panitchlaw.com
    dbutler@panitchlaw.com

*Counsel for Defendants*

# TABLE OF CONTENTS

I.   Introduction and Summary of the Arguments ...................................................... 1

II.   Concise Statement of Facts ................................................................................ 3

   A.   Emerson Electric's Marks ................................................................................ 3

   B.   Emerson Radio's Marks ................................................................................... 3

   C.   History of the EMERSON QUIET KOOL Mark ............................................ 4

   D.   Use of the EMERSON QUIET KOOL Mark .................................................. 7

III.   Argument ........................................................................................................... 8

   A.   Neither Plaintiff Can Meet Their Burden of Proving Abandonment .............. 8

      1.   Plaintiffs Have No Evidence to Support Their Cases.................................... 9

      2.   All Available Evidence Shows There Was No Abandonment .................................. 11

   B.   Defendants Should be Awarded Full Summary Judgment Because There is No Likelihood of Confusion ............................................................................................. 14

      1.   Emerson Electric's Claims Should All be Denied Because of Its Admissions in Prior Consent Agreements .................................................................................... 14

      2.   Emerson Radio's Claims Should be Denied Because of Its Admissions in Obtaining Ownership of its Marks ............................................................................... 16

      3.   Both Plaintiffs' Claims Should be Denied Because of Their Division of the Market in the General Trademark Agreements ............................................................. 18

   C.   Defendants Should be Awarded Summary Judgment on All Counts Under the Laches Doctrine........................................................................................................................ 22

      1.   Laches Should Bar EE's Claims Based on Its Knowledge of the 2010 Intent-to-Use Application........................................................................................................ 22

      2.   Laches Should Also Bar Both Plaintiffs' Claims Based on Their Decades of Knowledge of the EMERSON QUIET KOOL Mark Before the Alleged Abandonment.... 23

   D.   Defendants Should be Awarded Summary Judgment on Emerson Radio's Anticybersquatting Claim ............................................................................................. 26

   E.   Defendants Should be Awarded Summary Judgment on Emerson Radio's Dilution Claim 27

   F.   Defendants Are Entitled to Summary Judgment on EE's Cancellation Claim.................. 29

IV.   Conclusion ...................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*800-JR Cigar, Inc. v. GoTo.com, Inc.*,
   437 F. Supp. 2d 273 (D.N.J. 2006) ...................................................................................28

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .............................................................................................................8

*Barnes Grp., Inc. v. Connell Ltd. P'ship*,
   793 F. Supp. 1277 (D. Del. 1992) .......................................................................................9

*Bridgestone/Firestone Research, Inc. v. Auto. Club de l'Ouest de la France*,
   245 F.3d 1359 (Fed. Cir. 2001) ...........................................................................22, 23, 24, 26

*Buying For the Home, LLC v. Humble Abode, LLC*,
   459 F.Supp.2d 310 (D.N.J. 2006) ......................................................................................16

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .............................................................................................................8

*Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.*,
   333 F. Supp. 2d 239 (D. Del. 2004) ..................................................................................14

*Covertech Fabricating, Inc. v. TVM Bldg. Prods.*,
   855 F.3d 163 (3d Cir. 2017) ..............................................................................................15

*Crash Dummy Movie, LLC v. Mattel, Inc.*,
   601 F.3d 1387 (Fed. Cir. 2010) ........................................................................9, 11, 12, 13

*CSC Holdings, LLC v. Optimum Networks, Inc.*,
   731 F. Supp. 2d 400 (D.N.J. 2010) ....................................................................................16

*Fife & Drum, Inc. v. Delbello Enters., LLC*,
   No. 17-3676 (NLH/JS), 2019 U.S. Dist. LEXIS 190582 (D.N.J. Nov. 1, 2019)..............24, 25

*Lingo v. Lingo*,
   785 F. Supp. 2d 443 (D. Del. 2011) ..................................................................................28

*Marshak v. Treadwell*,
   240 F.3d 184 (3d Cir. 2001).............................................................................................8, 9

*Sanofi-Aventis v. Advancis Pharm. Corp.*,
   453 F. Supp. 2d 834 (D. Del. 2006) ..............................................................................14, 22

*United States Jaycees v. Philadelphia Jaycees*,
    639 F.2d 134 (3d Cir. 1981)..................................................................9

*Univ. of Pittsburgh v. Champion Prods.*,
    686 F.2d 1040 (3d Cir. 1982)..............................................................22

*Vitalo v. Cabot Corp.*,
    399 F.3d 536 (3d Cir. 2005)..................................................................8

## Statutes

15 U.S.C. § 1057(b) ................................................................................11

15 U.S.C. § 1125(d)(1)(A).....................................................................26

15 U.S.C. § 1127....................................................................................8

## Other Authorities

Fed. R. Civ. P. 56...................................................................................8

iv

I.   **INTRODUCTION AND SUMMARY OF THE ARGUMENTS**

This Brief is submitted by Defendants[1] in support of their motion for summary judgment. All of Plaintiffs' claims should be dismissed for three independent reasons.  Additionally, several of the miscellaneous counts of each Plaintiff should be individually dismissed.

First, both cases captioned above are premised on a fundamental flaw – that Defendants' predecessors abandoned the EMERSON QUIET KOOL trademark that Defendants now own and use.  Not only is this argument flawed, but Plaintiffs' cases rest entirely on suppositions, not evidence.  Proving abandonment requires a Plaintiff to show the mark was unused for a period with an intent to not resume use.  However, indisputable continuous evidence exists showing an intent to maintain or resume use of the mark for the entire relevant period.  In addition, evidence of use dates to at least 2010 through authenticated sales records and the testimony of Defendants' witnesses.  This evidence is entirely unrebutted – not only do Plaintiffs not have evidence affirmatively showing an absence of sales, but they did not even bother to try to obtain sales evidence from Defendants' predecessors.  In both cases, Plaintiffs' allegations of abandonment should be denied as the burden to prove abandonment is on each of them.

Second, Defendants are entitled to full summary judgment against Emerson Electric[2] and Emerson Radio.[3]  Both Plaintiffs have explicitly admitted that the EMERSON QUIET KOOL mark, as applied to Defendants' goods, is separate from and not confusing with their own marks. Emerson Electric explicitly consented to the separate registration of the EMERSON QUIET KOOL mark before *and* after the supposed abandonment, in 1977 and in 2011.  Emerson Radio acquired its marks from the same common owner as Defendants' predecessors subject to an

---

[1] Emerson Quiet Kool Co. Ltd. and Home Easy Ltd.
[2] Plaintiff Emerson Electric Co., also referred to as "EE."
[3] Plaintiff Emerson Radio Corp., also referred to as "ER."  This brief will refer to EE and ER jointly as "Both Plaintiffs" or the "Two Plaintiffs."

1

explicit agreement and admission that there was no likelihood of confusion between EMERSON QUIET KOOL and Emerson Radio.  In addition, EE and ER maintain agreements since at least 1991 to carve up the market under the EMERSON name and agree that certain goods are only available to one or the other.  By only selling these goods, the divisions between which are significantly narrower than between Defendants' goods and either Plaintiff's, and by using their respective logos next to the word "Emerson," Plaintiffs agreed there would be no actionable confusion.  By this logic, there also can be no actionable confusion against Defendants.

Third, both Plaintiffs' claims should be entirely barred by laches, regardless of whether there was an abandonment.  EE knew about a newly filed Intent-to-Use application in 2011 but did not file this case until 2017.  Shortly before these cases were filed, Defendants spent ███████ to buy the mark from their predecessor, establishing economic prejudice that would not have been suffered had Plaintiffs acted promptly.  Prior the alleged abandonment, Both Plaintiffs knew about and peacefully coexisted with the EMERSON QUIET KOOL products since at least the late 1970s.  Both had ample opportunity to challenge the mark but did not.  In those decades of delay, Defendants not only suffered the economic prejudice associated with starting their business, but countless business records have been lost and at least six potential witnesses have retired, passed away, or both.  Defendants have thus suffered significant evidentiary prejudice and are entitled to have both cases dismissed under the laches doctrine.

ER's Anticybersquatting claim should be denied because there is no evidence that Defendants adopted their domain name with bad faith intent.  The only evidence shows that Defendants relied on attorneys to clear their purchase of the EMERSON QUIET KOOL name.  Further, Defendants' President was told by ER in his prior employment that ER had no rights to make air conditioners.  Thus, Defendants did not act in bad faith.

ER's dilution claim should be denied because there is no tie between any action taken by Defendants and ER's loss in brand value.  If the EMERSON QUIET KOOL mark was not abandoned, there is no record evidence showing that the Emersion Radio marks were famous before the EMERSON QUIET KOOL mark was first used in 1949.  If the mark was abandoned, however, then its resuscitation in the 2010s came long after ER's brand started being devalued by hundreds of millions of dollars in the prior decade (i.e., ER's sales and licensing revenue dropped off significantly before Defendants entered the market).

EE's claim to cancel Defendants' trademark registration fails due to EE's consent to that registration in both 1977 and 2011.  EE cannot take that consent back because they allege Defendants are using a stylized version of the EMERSON QUIET KOOL mark.  The registration is a word mark –  EMERSON QUIET KOOL – which does not incorporate any stylization.

For each of these reasons, Defendants respectfully request the Court enter summary judgment in their favor in both cases.

## II.   CONCISE STATEMENT OF FACTS

The parties to these disputes date back, and previously coexisted for, many decades.[4]

### A.  Emerson Electric's Marks

EE was founded around 1890 and has used the "Emerson" name in various forms since then.  D.I. 1 in C.A. No. 17-cv-01846, ¶ 7.

### B.  Emerson Radio's Marks

The Emerson Phonograph Company, which was not affiliated with the current entity that is Plaintiff Emerson Radio Corp., originated the Emerson Radio name in around 1916.  D.I. 30 in

---

[4]  Despite Plaintiffs' posture that the EMERSON QUIET KOOL was never in use prior to Defendants' use beginning in 2017.

C.A. No. 20-cv-01652, ¶ 20.  The Emerson Radio marks were owned by National Union Electric Corp. ("NUE") in the 1960s and 1970s.  *Id*, ¶ 23.

NUE licensed the Emerson Radio trademarks to ███████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ █████████████████████████████████████████████ ███████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████

Major (renamed to Emerson Radio Corp.), finally acquired ownership of the Emerson Radio marks in 1984.  Exhibit B. ███████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████.

**C.  History of the EMERSON QUIET KOOL Mark**

Contrary to Plaintiffs' assertions, Defendants are not some interlopers claiming a new "Emerson" mark.  The EMERSON QUIET KOOL brand co-existed with Both Plaintiffs' marks for over 70 years, with no disputes arising before these cases as to use on room air conditioners and dehumidifiers.  The EMERSON QUIET KOOL mark dates to 1949 (Exhibit C), when it was

created for use on room air conditioners by Defendants' and ER's common predecessor, NUE, which had acquired the Quiet-Heet Corporation (C.A. 20-cv-01652, D.I. 30, ¶ 22).

In 1983, one year *before* it sold the Emerson Radio marks, NUE sold the EMERSON QUIET KOOL business for air conditioning units to Emerson Quiet Kool Corp.[5]  Exhibit D. Unlike the sale to ER, this sale came with no restrictions on the mark.  The EMERSON QUIET KOOL mark was assigned several more times (Exhibits E and F) before being acquired by Fedders North America, Inc. ("Fedders") (Exhibit G).  Fedders declared bankruptcy in 2008 (the source of Both Plaintiffs' claims of abandonment), but the EMERSON QUIET KOOL business was purchased by Elco Holdings Ltd. in the bankruptcy proceeding.  Exhibit H.  Elco owned a Hong Kong-based company called Airwell Hong Kong Technologies Limited ("Airwell"), to which it directed Fedders to acquire the EMERSON QUIET KOOL marks.  Exhibit I.[6]

In 2009, the USPTO rejected three of EE's pending trademark applications over a likelihood of confusion with the EMERSON QUIET KOOL registrations.  Exhibit K, ¶ 6. Among them were Serial Nos. 76/975,789, for "humidifiers," and 76/978,210, for "household air cleanings; air purifying units ...; ventilating fans and blowers ...; ceiling fans; air circulators." *Id.*, ¶ 4.  To overcome these rejections, EE obtained a Consent Agreement ("the 2009 Consent Agreement") from Airwell in which EE made the following admissions:

- there had been "no confusion to date" between the marks (¶ 7);

- the "Airwell Marks and the Emerson Marks are, or can be made, to be, sufficiently different in their entireties as to appearance and commercial impression, when taken with the differences between the distinct goods and/or services, to *prevent likelihood of confusion* (¶ 8.a., emphasis added);

---

[5] A now-defunct entity unrelated to Defendants except through the mark's chain-of-title.
[6] A detailed recitation of this chain of title was provided to ER by interrogatory response, which is attached as Exhibit J.  *See* pages 6-8.

- the "Parties' respective goods and/or services … are distinct and non-overlapping" (¶ 8.b.); and

- EE "release[d] and discharge[d] Airwell … from any claim that the Airwell Marks have been abandoned prior to the Effective Date of this Agreement" (¶ 12).

Serial Nos. 76/975,789 and 76/978,210 then registered as Registration Nos. 3,861,152 and 3,861,153 (Exhibits L and M), two of the Registrations asserted by EE (*see* D.I. 1 in C.A. No. 17-cv-01846, at 7).  EE would not possess these registrations if not for these concessions, which it now seeks to take back.

The EMERSON QUIET KOOL registrations were due for renewal in 2010.  Because Airwell was still establishing its business after acquiring assets from the bankrupt Fedders, one of the then-existing registrations was allowed to lapse on June 23, 2010 (Exhibit N), but only after a new application was filed on March 1, 2010, under the Intent-to-Use ("ITU") provisions, thus preserving Airwell's rights in and intent to use the mark (Exhibit O).  The ITU application was for the EMERSON QUIET KOOL mark in "portable compact residential window and wall room air conditioning units" and specifically incorporated the prior registrations.  Exhibit P.

In 2011, the USPTO rejected the ITU application over three EE registrations, including Nos. 3,771,945 (for "environmental measuring, testing and monitoring instruments" et al.) and 1,795,612 (for "compressors for use in refrigeration" et al.) (Exhibit Q, ¶ 2), both of which are asserted by EE here (*see* D.I. 1 in C.A. No. 17-cv-01846, at 5-8).  EE and Airwell signed another Consent Agreement ("the 2011 Consent Agreement"), in which EE admitted:

- EE did not "anticipate *any confusion* arising from the concurrent use of the[] respective marks…" (¶ 4, emphasis added);

- EE "consents to the registration of the Airwell Mark in the Airwell Application and to use of the Airwell Mark…" (¶ 5);

- the respective marks "are, or can be made, to be, sufficiently different in their entireties as to appearance and commercial impression, when taken with the

differences between the distinct goods and/or services, such that ***there is no likelihood of confusion***…" (¶ 5.a., emphasis added); and

- the parties' "respective goods and/or services are sufficiently different when used in connection with their respective marks" (¶ 5.b).

Based on these admissions, the USPTO registered the EMERSON QUIET KOOL mark, which Both Plaintiffs now seek to cancel.  This registration and all other rights in the EMERSON QUIET KOOL mark were later assigned to Emerson Quiet Kool Co. Ltd. in 2017, which allows Home Easy Ltd. to distribute EMERSON QUIET KOOL products.  Exhibits R and S.

### D.  Use of the EMERSON QUIET KOOL Mark

The record here lacks any evidence regarding actual sales made under the EMERSON QUIET KOOL name prior to about 2010 – neither Plaintiff made any effort to take discovery on this issue, despite their claims of abandonment.  However, Registration No. 1,119,176 was renewed for a ten-year term on July 29, 1999 through Fedders's filing of a Statement of Use. Exhibit T.  Registration No. 1,612,846 was renewed on February 23, 2001.  Exhibit U.

Isaac Xiao, Home Easy's President, was employed by Midea North America Co., an original equipment manufacturer, from 2002 to 2014.  While at Midea, Mr. Xiao began negotiating with Airwell in 2010 to manufacture EMERSON QUIET KOOL products for the U.S. market.  Exhibit V, at 46:6-47:8; Exhibit W, at 27:14-33:19.  Products were developed through 2011, ordered by Defendants' predecessors in 2012, and sold to U.S. customers from 2012 to 2016.  Exhibit V, at 47:21-48:3, Exhibit W, at 33:4-39:12; Exhibit JJ, at 97:22-104:21. Defendants made sales of the accused products from 2016 to present.  Exhibit X, at 62:14-21. Defendants' products include portable, window, and room air conditioner units and dehumidifiers.

III.   <u>ARGUMENT</u>

The purpose of summary judgment is to dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A factual dispute is material only if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Whether a genuine issue of material fact exists will be determined by asking if a reasonable jury could return a verdict for the non-moving party. *Id.*

The nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *Celotex*, 477 U.S., at 322-23. Instead, to defeat summary judgment, "the non-moving party must produce admissible evidence containing specific facts showing that there is a genuine issue for trial." *Vitalo v. Cabot Corp.*, 399 F.3d 536, 542 (3d Cir. 2005) (internal quotation omitted).

**A. Neither Plaintiff Can Meet Their Burden of Proving Abandonment**

Both Plaintiffs assert the EMERSON QUIET KOOL mark was abandoned by Defendants' predecessor(s) around 2008-2014.[7] This suggestion fails for two reasons: first, neither Plaintiff has *any* evidence to support its claims, and second, there is affirmative evidence of actual use and/or intent to use in each of the relevant years.

To establish abandonment, the plaintiff must prove non-use of the mark *and* an intent to abandon it. *Marshak v. Treadwell*, 240 F.3d 184, 198 (3d Cir. 2001); 15 U.S.C. § 1127. This is

---

[7] EE asserts the abandonment period was from 2003-2014. Exhibit Y, at 9  However, EE previously contractually released any abandonment claims prior to 2009. Exhibit K, ¶ 12. ER makes a number of allegations in its Amended Complaint, but the only instance in which is comes close to stating a date of abandonment is that certain registrations were "abandoned by 2011." C.A. 20-cv-01652, D.I. 30, ¶ 57.

true for both registered marks and for common law rights.  *Marshak*, 240 F.3d at 198.  While

nonuse for three consecutive years creates a rebuttable presumption of intent to abandon, this

merely shifts the burden of production to the trademark owner to produce evidence of either use

or intent to resume use.  *Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1391 (Fed.

Cir. 2010).  The burden of proof ***never*** shifts away from the challenger (here, Plaintiffs).  *Id*.

      1.  <u>Plaintiffs Have No Evidence to Support Their Cases</u>

Because "abandonment, being in the nature of a forfeiture, must be strictly proved,"

proving it requires ***actual evidence***.  *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d

134, 139 (3d Cir. 1981).  Where the "record is silent regarding registrant's use or nonuse … there

is no basis for us to infer nonuse…."  *P. A. B. Produits Et Appareils de Beaute v. Satinine*

*Societa in Nome Collettivo di S.A. e M. Usellini*, 570 F.2d 328, 333 (C.C.P.A. 1978); *see also*

*Barnes Grp., Inc. v. Connell Ltd. P'ship*, 793 F. Supp. 1277, 1305 (D. Del. 1992) (where the

"record does not show either use or nonuse," Plaintiff's burden to prove non-use is not satisfied).

Here, that is exactly what happened.  Both Plaintiffs claim abandonment, but now, four

years into the cases and after full discovery periods, they still have ***no evidence***.

EE's corporate representative admitted 

Exhibit Z, at 120-132.  He even

admitted that EE ████████████████████████████████.  *Id*., at 79:2-9.

ER, on the other hand, issued subpoenas for sales records to various sellers or

manufacturers: Midea America Corp., New York Electronics & Appliances, BrandsMart, and

AC & Appliances Wholesaler Corp.  Exhibit AA.  Only BrandsMart responded, and its response

indicated sales of air conditioners in every year from 2013 to 2019.  Exhibit BB.  Perhaps

worried more responses would further disprove its claims, ER abandoned the other subpoenas.

Instead, each Plaintiff just assumes there was non-use simply because they were not aware of it.  Emerson Radio's corporate representative testified that ER's basis for claiming abandonment was that "█████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████"  Exhibit CC, at 169:15-21.  When pressed for real evidence that the EMERSON QUIET KOOL mark was not used, Mr. Smith retorted by asking Defendants' counsel to "██████████████ ███████████."  *Id.*, at 170:14-17.  Similarly, neither Plaintiff even tried to obtain evidence of any prior owner's ***intent*** with respect to the mark (i.e., to continue use or not resume use).

This is not a case where Plaintiffs had nowhere to turn.  Fedders, who owned the mark until 2008, declared Chapter 11 bankruptcy, not Chapter 7, and still exists at least in some form. Exhibit DD.  Plaintiffs could have subpoenaed Fedders for its sales records but did not.[8] American Ductless AC Corp., Defendants' immediate predecessor, also still exists.  Exhibit EE. Plaintiffs could have subpoenaed American Ductless for its sales records but did not.  ER has known of Airwell's former North American financial director, Yantao Yu, since at least August 29, 2017, and EE has known of him since May 18, 2020.  Exhibits FF and GG; D.I. 48 in C.A. 17-cv-01846.  Defendants provided a Declaration from Mr. Yu in ER's case and a sworn statement issued by him in a Chinese court in both cases, both of which showed sales from 2008-2012 (the entire period Airwell owned the mark).  *Id*.  EE did not attempt to subpoena Mr. Yu for relevant information, and ER withdrew its subpoena after Defendants stated they were not planning to call Mr. Yu at trial, demonstrating ER was not interested in Mr. Yu's evidence.

---

[8]  Defendants' counsel specifically invited EE to do so at the end of Mr. Xiao's deposition. Exhibit V, at 71:18-21.

10

Simply put, Both Plaintiffs failed to obtain any evidence to support their claims of abandonment, and that alone is enough to find for summary judgment in Defendants' favor that the EMERSON QUIET KOOL mark was not abandoned.

      2.  <u>All Available Evidence Shows There Was No Abandonment</u>

Contrary to Plaintiffs' claims, Defendants can easily satisfy both elements of the abandonment analysis (i.e., there is no abandonment) with concrete evidence, even though the burden is on Plaintiffs to do the opposite. In *every one* of the relevant years,[9] the evidence shows actual use, intent to use, or both.

On February 8, 2008, Elco Holdings Ltd., Fedders, and Emerson Quiet Kool Corp. (then owned by Fedders) signed an Asset Purchase Agreement under which Elco would acquire the Fedders and Emerson Quiet Kool air conditioner businesses. Exhibit H. Section 5.13 of that Agreement required Fedders to cease use of its brand names, including "Emerson Quiet Kool." *Id.*, at EQK0000048-49. This language implies that up to that date, Fedders was still using the EMERSON QUIET KOOL name; otherwise, there would have been nothing to cease.

On July 7, 2008, pursuant to the Asset Purchase Agreement, Fedders assigned the EMERSON QUIET KOOL brand to Airwell (Elco's subsidiary). Airwell recorded the assignment of the mark with the USPTO the next day. Exhibit I. "[C]ommon sense supports the conclusion that [a purchaser] would not have recorded [the seller's] trademark assignment with the USPTO [at the time of sale] unless it intended to use the [] mark within the foreseeable future." *Crash Dummy Movie*, 601 F.3d at 1391.

---

[9] The EMERSON QUIET KOOL mark enjoyed a statutory presumption of validity during its registrations up through 2010 and 2011. 15 U.S.C. § 1057(b). Thus, since there is no evidence of sales records before then, only post-2010 conduct is truly relevant here.

In 2009, EE petitioned the USPTO to cancel the then-existing EMERSON QUIET

KOOL registrations, alleging the very same abandonment claim they bring to this Court.  Exhibit

K, ¶ 6.  Airwell required dismissal of the cancellation proceeding in exchange for granting the

2009 Consent Agreement.  *Id*., ¶ 11.  "Common sense" likewise supports the conclusion that

Airwell would not have opposed cancellation of its marks if it intended to abandon them.  In that

Agreement, each party agreed it would not "promote, advertise or distribute its goods and/or

services in any way that would lead consumers to associate it with the other Party or its goods

and/or services."  *Id.*, ¶ 9.  Airwell would not have agreed to language about future use of the

marks if it did not intend to use them.  EE also agreed to release Airwell from any claims that the

EMERSON QUIET KOOL mark had been abandoned prior to the Agreement.  *Id*., ¶ 12.

In 2010, because the then-existing EMERSON QUIET KOOL registrations would expire

if a Statement of Use could not be filed, Airwell filed a new EMERSON QUIET KOOL

application under the ***Intent to Use*** ("ITU") provisions of trademark law.[10]  Exhibit O.  This is an

express statement that Airwell ***intended to use*** the mark.

Also in 2010, Airwell began plans to start manufacturing air conditioners under the

EMERSON QUIET KOOL name.  Isaac Xiao, currently President of Home Easy Ltd. but then

the President of Midea North America, testified that in his role with Midea, he met with several

members of Airwell about "how to design the product and how to market the product, and a lot

of the business agreements and condition, and also the cost."  Exhibit V, at 46:6-47:8; Exhibit

W, at 27:14-33:19.  He further testified that a contract was signed, but that contract is not within

his possession as he is no longer with Midea.  Exhibit V, at 47:12-16; Exhibit W, at 36:3-5.

---

[10] Note that "cancellation of a trademark registration does not necessarily translate into abandonment of common law trademark rights.  Nor does it establish its owner's lack of intent to use the mark."  *Crash Dummy Movie*, 601 F.3d at 1391.

In 2011, after the USPTO rejected the ITU application over a possibility of confusion with some of EE's registrations, Airwell and EE entered into another Consent Agreement in which EE "consent[ed] to registration of the" EMERSON QUIET KOOL Mark."  Exhibit Q, ¶ 5. This Agreement expressly stated it "concern[ed] Airwell's **use** and registration" of the EMERSON QUIET KOOL mark.  *Id.*, at 1 (emphasis added).

In 2012, the EMERSON QUIET KOOL mark was assigned to Elco Holland B.V. Exhibit HH.  That assignment was recorded soon after, showing Elco's ***intent to use*** the mark.

Starting in late 2012, and in every year since, there is indisputable evidence that products were sold under the EMERSON QUIET KOOL mark.  Exhibit II.  Mr. Xiao also testified to Midea's manufacture of EMERSON QUIET KOOL air conditioners for Airwell in 2012. Exhibit V, at 47:21-48:3; Exhibit W, at 33:4-39:12.  Mr. Xiao and Haimo Zhong (an owner of Emerson Quiet Kool Co. Ltd.) each testified to sales records in this period.  Exhibit V, 50:21-55:19; Exhibit JJ, at 97:19-104:21.

In 2014, American Ductless Corp. purchased the EMERSON QUIET KOOL brand from Elco Holland, recording the assignment just a few months later.  Exhibits KK and LL.  Again, American Ductless would not have done so if it did not intend to use the mark.  *Crash Dummy Movie*, 601 F.3d at 1391.  In 2017, Emerson Quiet Kool Co. Ltd. purchased the brand from American Ductless.  Exhibit S.  The assignment of the mark was recorded just one month later, again demonstrating an ***intent to use***.  *Crash Dummy Movie*, 601 F.3d at 1391.

There is therefore no genuine dispute of fact regarding the supposed abandonment of the EMERSON QUIET KOOL mark.  The evidence above clearly satisfies Defendants' burden of *production* regarding evidence of use or intent to resume use, even though Plaintiffs have not actually produced sufficient evidence to shift that burden to Defendants.  Thus, Plaintiffs cannot

meet their burden of proving the EMERSON QUIET KOOL mark was abandoned and

Defendants respectfully request a summary judgment ruling that the mark was <u>not</u> abandoned.

### B. Defendants Should be Awarded Full Summary Judgment Because There is No Likelihood of Confusion

1. <u>Emerson Electric's Claims Should All be Denied Because of Its Admissions in Prior Consent Agreements</u>

Defendants should be awarded summary judgment against all of Emerson Electric's

remaining claims because Emerson Electric previously admitted that another party's use of the

EMERSON QUIET KOOL mark was not confusing with its own marks.  In 2011, to the

USPTO's rejection of the ITU application, EE consented to Airwell's registration, admitting

"there is no likelihood of confusion" between EE's marks and EMERSON QUIET KOOL and

EE's goods and services "are sufficiently different" than the "portable compact residential

window and wall room air conditioning units" covered by the application, which are at issue in

this case.  *Id.*, ¶ 5.  EE's statements provide three independent bases to grant summary judgment

to Defendants, as every one of EE's claims requires proving a likelihood of confusion.[11]

First, Defendants acquired rights not only to the EMERSON QUIET KOOL marks, as

described above, but also to the Consent Agreement itself.  The Consent Agreement was

originally executed by Airwell (Exhibit Q), which was ██████████████████████.

Exhibit MM.  Elco Holland BV sold the EMERSON QUIET KOOL business and name to

American Ductless AC Corp. on August 8, 2014.  Exhibits KK and LL.  These parties later

---

[11] For Count 1, federal trademark infringement; Count 2, federal unfair competition; Count 6, Delaware unfair competition; and Count 7, common law trademark infringement, *see Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.,* 333 F. Supp. 2d 239, 244 (D. Del. 2004) and *Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F. Supp. 2d 834, 847 n.2 (D. Del. 2006).  Counts 3 and 5 were withdrawn (D.I. 124, at 12:20-22) and Count 4 was dismissed (D.I. 23).  Count 8 alleges breach of the 2011 Consent Agreement through a confusing use of the mark (D.I. 1, ¶ 106) and Count 9 alleges cancellation for an allegedly confusing use (D.I.1, ¶ 115).

confirmed in a *nunc pro tunc* assignment that the rights in the 2011 Consent Agreement were also intended to be part of that transfer.  Exhibit NN.  American Ductless later sold the EMERSON QUIET KOOL business and name to Defendant Emerson Quiet Kool Co. Ltd. on January 10, 2017.  Exhibit S.  This sale agreement explicitly assigned both Consent Agreements to Defendant Emerson Quiet Kool Co., Ltd.  *Id.*, ¶ 1.1.  To the extent there is any dispute over the formality of that assignment, these parties also confirmed in a *nunc pro tunc* assignment that the rights to the 2011 Consent Agreement were part of that transfer.  Exhibit OO.   Thus, Defendants have at all relevant times held rights to the 2011 Consent Agreement.

Second, even if Defendants never acquired rights under the 2011 Consent Agreement, EE's ***explicit admissions*** therein relate to the mark and the goods, not to a party: it consented to "registration of ***the Airwell Mark*** … and to use of ***the Airwell Mark***, in connection with ***the Airwell Goods***…."  Exhibit Q, ¶ 5 (emphasis added).  Nothing in the Agreement ties either of these terms to Airwell itself.  The "Airwell Mark" is defined simply as "the mark EMERSON QUIET KOOL" and the "Airwell Goods" were defined only as "portable compact residential window and wall room air conditioning units."  *Id*., ¶ 1.  Thus, by the plain language of the 2011 Consent Agreement, Emerson Electric was not just consenting to permissible actions by Airwell Hong Kong Technologies Ltd., but rather ***admitted*** that use of the EMERSON QUIET KOOL mark on portable compact residential window and wall room air conditioning units provided "no likelihood of confusion" with Emerson Electric's marks, regardless of their source.  *Id*., ¶ 5.a.

Third, the Court can find summary judgment for Defendants under the acquiescence doctrine.  Acquiescence exists "when the trademark owner, by affirmative word or deed, conveys its implied consent to the use of a mark."  *Covertech Fabricating, Inc. v. TVM Bldg. Prods.,* 855 F.3d 163, 175 (3d Cir. 2017) (internal quotation omitted).  This is undoubtedly met here – the

agreement is specifically titled a "Consent Agreement" and specifically authorizes third-party use of the mark on the goods at issue.

Defendants therefore respectfully request the Court enter summary judgment in Defendants' favor on all of EE's pending claims based on no likelihood of confusion.

2. Emerson Radio's Claims Should be Denied Because of Its Admissions in Obtaining Ownership of its Marks

Defendants should be awarded summary judgment against all of Emerson Radio's claims because ER would not own its asserted marks if not for an admission that there is no likelihood of confusion between them and the EMERSON QUIET KOOL mark. Each of ER's claims requires proving a likelihood of confusion.[12]

The Emerson Radio marks and the EMERSON QUIET KOOL mark were commonly owned by NUE from about 1960 to the early 1980s. ER's predecessor 

" *Id.*, at ER26457. The license also included the stipulation and admission that "

*Id.*, at ER26459.

This provision is even underlined in ER's copy of the document.[13]  *Id.*

---

[12] For Count 1, federal trademark infringement; Count 2, federal unfair competition; Count 3, Lanham Act false advertising; Count 5, NJ trademark infringement; Count 7, NJ false designation of origin; Count 8, common law trademark infringement; and Count 9, NJ common law unfair competition, *see Buying For the Home, LLC v. Humble Abode, LLC,* 459 F.Supp.2d 310, 317 (D.N.J. 2006).  For Count 4, anti-cybersquatting, *see CSC Holdings, LLC v. Optimum Networks, Inc.,* 731 F. Supp. 2d 400, 409 (D.N.J. 2010).  For Count 6, NJ trademark dilution, ER admitted by letter that its dilution claim rests on allegations of confusion.  Exhibit PP, at 1.

[13]

. Exhibit CC, at 97:22-98:17; 126:24-

ER's predecessor did not own the Emerson Radio marks until 1984 (Exhibit B), after the EMERSON QUIET KOOL marks were separately sold by NUE in 1983.  The 1984 purchase Agreement specifically ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████."  *Id.* Thus, ER's purchase of the Emerson Radio marks was ████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ██████████████████████████████.

That admission remains as true today as it did in 1973 and 1984.  ER has not identified any changed circumstances to defeat the long-established coexistence in this crowded field. Instead, ER merely claims that the EMERSON QUIET KOOL marks were abandoned sometime around 2008.  Even if that were true (it is not, as explained below), it does not grant ER any greater rights than it previously had.  If ER believed its rights expanded to cover room air conditioners, it should have moved into that market after the alleged abandonment of the EMERSON QUIET KOOL marks.  It did not and, as explained below, it cannot, due to its contractual obligations and stipulations of ██████████████████████████.  Thus, as far as Emerson Radio should be concerned, ***anyone*** could have moved into the "Emerson" room air conditioner space after the supposed abandonment.  Even if the Court were to treat Defendants as new claimants to that space, Emerson Radio still has no rights to claim confusion.

What is more, Emerson Radio's actions demonstrate that it knows it has no rights to air conditioners and no confusion exists between its marks and air conditioners.  [Exhibit W, at 18:11-21:20.  ER entered a 2004 General Trademark Agreement with EE, which, between the

---

127:1.  Given Mr. Smith's statement that the document was not located until "the attorneys came over to review our files," ER's attorneys also did not review this critical document prior to filing this litigation either, demonstrating the baselessness of ER's case.  *Id.*

two of them, 

▆. Exhibit QQ, at Exhibit D ¶ B.  ER's corporate representative, Mr. Smith, further testified

that ▆▆▆▆▆▆▆▆▆▆▆▆ (Exhibit CC, at 146:13-16) and that the purpose of

the General Trademark Agreement was ▆▆▆▆▆▆▆▆▆▆▆▆▆

(Exhibit CC, at 140:9-141:8).  Therefore, Defendants respectfully submit they should be granted

summary judgment of no likelihood of confusion as to **all** of Emerson Radio's claims due to

Emerson Radio's prior admissions.

3. <u>Both Plaintiffs' Claims Should be Denied Because of Their Division of the Market in the General Trademark Agreements</u>

Defendants should be granted summary judgment of no likelihood of confusion on all

Counts due to the Plaintiffs' actions in dividing up the market in their General Trademark

Agreements.  Since at least 1991, Emerson Radio and Emerson Electric have semi-peacefully

coexisted and preserved the validity of their own marks based on detailed General Trademark

Agreements that define how each party must use its marks, declaring by contract that consumers

will not be confused between them.  The currently operative agreement was executed in 2004.

The crux of the General Trademark Agreement is that ▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆.  Exhibit QQ, §§ 2,

4(a), 5(a). 

---

[14] Within this paragraph, Exhibits C and D refer to the Exhibits to the General Trademark
Agreement, not Exhibits C and D to this brief.

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

If consumers are not confused between integrated and stand-alone home security products, there is no rational basis for finding confusion between Emerson Electric's components for heating ventilation and air conditioning ("HVAC") systems and the stand-alone air conditioners sold by Defendants.  Emerson Radio's products are even further afield – it alleges its closest comparable products are compact refrigerators.  Clearly, however, if consumers will not be confused by Plaintiffs' refrigerators merely because they are different sizes, nobody will be confused between a compact refrigerator and a window air conditioner merely because they both involve cold air.  And, just like the two Plaintiffs distinguish themselves with logos next to the word "Emerson," Defendants have *always* paired the words "QUIET KOOL" with "EMERSON."

In these respects, this case is almost identical to one in which the Seventh Circuit Court of Appeals long ago derided two plaintiffs for bringing such a claim.  In *Cal. Fruit Growers Exch. v. Sunkist Baking Co*., one plaintiff used the mark "SUNKIST" on citrus fruits and the other used "SUN-KIST" on canned and dried fruits and vegetables.  166 F. 2d 971, 971-72 (7th Cir. 1947).  Like the Two Plaintiffs here, the two plaintiffs in *Sunkist* agreed to co-exist by contract.  *Id*., at 972.  And, similar to the two cases here, they then teamed up to sue the Sunkist Baking Company who used the "SUNKIST" mark on various bread products.

The Seventh Circuit effectively found the plaintiffs' case frivolous in *Sunkist*.  Based in large part on the fine, almost indistinguishable lines those two plaintiffs drew between their respective products in their contract, it stated that "[u]nless 'Sunkist' covers everything edible under the sun, we cannot believe that anyone whose I. Q. is high enough to be regarded by the law would ever be confused or would be likely to be confused in the purchase of a loaf of bread branded as 'Sunkist' because someone else sold fruits and vegetables under that name."  *Id*., at 973-74.  The Court continued: "The trade-marks should be confined substantially to the articles for which they were authorized, otherwise, why limit the marks at all?"  *Id*., at 974.  Further:

> There is another strange aspect about this confusion which the plaintiffs contend is likely to occur. It will be observed that the plaintiffs have launched into the market two classes of goods under the marks 'Sunkist' and 'Sun-Kist,' *which goods are much more nearly of the same class and descriptive properties than the defendants' bread is of the same class and descriptive properties as any of the products of the two plaintiffs*; and this is all done without confusion because the parties have agreed, forsooth, there shall be no confusion.  *Granted the plaintiffs had a right to contract away the public's likelihood of confusion from their closely related products sold all over the United States and in foreign countries, their cry that there is a likelihood of confusion of the source of a loaf of bread put out by a local bakery at Rock Island, Illinois, with their products because they market fruits and vegetables under the same name, is hardly audible to us*.  When a customer bought a jar of jelly under the name 'Sunkist,' he could not be confused as to whether it came from California Fruit Growers Exchange or California Packing Corporation.  The plaintiffs had taken care of that by contract.  We

are supposed to believe that when a customer bought fruits or vegetables under the name 'Sunkist,' he was not confused as to whether the fruit came from the California Fruit Growers Exchange or the vegetables from the California Packing Corporation; but if he bought a loaf of bread under the name 'Sunkist,' he was likely to think that he bought it from one or the other of the plaintiffs because they sold fruits and vegetables, but never bread. ***With the plaintiffs practicing such hocus-pocus with the trade-name 'Sunkist,' we shall ask to be excused when we are admonished by these dividers of confusion by contract to hear their vice president and advertising manager shout confusion on behalf of the purchasing public***.

***What these plaintiffs seek to do is to monopolize the word 'Sunkist' as applied to all edible foods***. That is the opinion of the advertising manager of Exchange, above quoted. We think that there should be more substantial evidence than this record affords before we give our sanction to such extension. *Id*., at 975 (emphasis added).

The skepticism expressed by the Seventh Circuit judges who heard the *Sunkist* case should equally apply here. Just like in *Sunkist*, these Two Plaintiffs seek to monopolize the word "Emerson," not just on one class of goods, but effectively across the entire market. And just like in *Sunkist*, they attempt to do so by drawing the finest of lines between their own products and simultaneously ***both*** trying to ensnare products that neither has a trademark registration to and that neither makes or sells. Despite their acknowledgement that the purchasing public can make some undefined distinction between compact and full-size refrigerators, between integrated and stand-alone home security products, and between lawn mowers and lawn vacuums just because each Plaintiff places a logo next to their name, they ***both*** come to this Court and claim the public cannot distinguish between an HVAC system and a stand-alone air conditioner or between a compact refrigerator and a stand-alone air conditioner. Defendants respectfully submit that, to use the Seventh Circuit's vivid language, these two "dividers of confusion" should not be permitted to "practic[e] such hocus-pocus" with their respective but identical trade names and summary judgment should be awarded to Defendants on all Counts.

### C.  Defendants Should be Awarded Summary Judgment on All Counts Under the Laches Doctrine

Claims for trademark infringement can be barred for laches where two elements are present: "(1) inexcusable delay in instituting suit, and (2) prejudice resulting to the defendant from such delay." *Univ. of Pittsburgh v. Champion Prods.*, 686 F.2d 1040, 1044 (3d Cir. 1982). "[O]utrageous, unreasonable, and inexcusable delay" bars all claims for relief; less egregious delay bars claims for past infringement, not for prospective injunctive relief. *Id.*, at 1044-46. Where a plaintiff "sleeps on his rights for a period of time greater than the applicable statute of limitations, the burden of proof shifts to the plaintiff to prove the absence of such prejudice to the defendant as would bar all relief." *Id.*, at 1045.

"Two general categories of prejudice may flow from an unreasonable delay: prejudice at trial due to loss of evidence or memory of witnesses, and economic prejudice based on loss of time or money or foregone opportunity." *Bridgestone/Firestone Research, Inc. v. Auto. Club de l'Ouest de la France*, 245 F.3d 1359, 1362 (Fed. Cir. 2001).  "Economic prejudice arises from investment in and development of the trademark, and the continued commercial use and economic promotion of a mark over a prolonged period adds weight to the evidence of prejudice." *Id.*, at 1363.  Reliance is not a necessary element of laches. *Id.*

### 1.  Laches Should Bar EE's Claims Based on Its Knowledge of the 2010 Intent-to-Use Application

In Delaware, inexcusable delay is measured against the analogous state statute of limitations, which is three years. *Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F. Supp. 2d 834, 855-56 (D. Del. 2006).  EE admitted in its Complaint that it not only knew about Defendants' predecessor's attempt to register the EMERSON QUIET KOOL mark by 2011, but it actively consented to that registration.  Exhibit Q.  This case was not filed until 2017, six years later.

22

Under *Champion Products*, that alone is sufficient to prove laches and shift the burden of proof onto EE to prove no prejudice.

Despite the shifted burden of proof, Defendants can affirmatively prove ample prejudice: nearly their entire business is predicated on the fact that EE's 2011 consent to the EMERSON QUIET KOOL mark. Defendants would not have expended ███████ to purchase the mark (Exhibit S, ¶ 1.2) and start their business had EE timely made their objection to the application in 2011 – that consent is explicitly referenced in the Purchase & Sale Agreement by which Defendants bought the mark. Exhibit S, ¶ 1.1.

Defendants will also suffer "prejudice at trial due to loss of evidence or memory of witnesses…." *Bridgestone*, 245 F.3d at 1362. Mr. Xiao testified to a contract between Airwell and Midea in around 2010 regarding development of EMERSON QUIET KOOL air conditioners. Exhibit V, at 47:12-16; Exhibit W, at 36:3-5. This contract would directly refute Plaintiffs' claims of abandonment by showing Airwell's intent to develop the EMERSON QUIET KOOL business shortly after purchasing the mark from Fedders. Had Emerson Electric timely challenged the EMERSON QUIET KOOL mark in 2011, Airwell could have produced this contract, as it was the owner of the mark at the time. Instead, Emerson Electric slept on its rights and should not now be allowed to proceed against Defendants.

2. <u>Laches Should Also Bar Both Plaintiffs' Claims Based on Their Decades of Knowledge of the EMERSON QUIET KOOL Mark Before the Alleged Abandonment</u>

Separately from the 2010 ITU Application, Both Plaintiffs' claims should all be barred based on their decades of coexistence with the EMERSON QUIET KOOL mark.

a. *EE's Inexcusable Delay*

EE has known about the EMERSON QUIET KOOL mark since at least 1977, when it entered into an agreement with ████████████████ . Exhibit RR. EE's corporate

representative testified that EE believes it has evidence of actual confusion dating "back to the late 1970s." Exhibit Z, at 15:4-15.  EE also knew about Reg. No. 1,119,176 since at least 1987, when EE opposed a separate registration of EMERSON QUIET KOOL on refrigerators, but did not challenge the '176 Registration for air conditioning units.  Exhibit SS, at 7.  EE also knew about Reg. No. 1,612,846 for the mark on dehumidifiers since 1990, when the application that led to that Registration was published in the Official Gazette.  *Id.*, at 7.  EE allowed that application to register without challenge.  Thus, EE knew about the EMERSON QUIET KOOL mark for vastly longer than three years before the mark was allegedly abandoned.  *See Fife & Drum, Inc. v. Delbello Enters., LLC*, No. 17-3676 (NLH/JS), 2019 U.S. Dist. LEXIS 190582, at *23-24 (D.N.J. Nov. 1, 2019) (laches claim should have been filed before an alleged abandonment and therefore still applies even after cessation and reopening of Defendant's business).  That alone is sufficient to prove Defendants' defense and shift the burden onto EE.

However, like above, Defendants suffered prejudice sufficient to affirmatively prove the element.  Economic prejudice is abundant.  Defendants would not have spent ███████ to purchase the mark and start their business had EE timely made its objection to the mark in any of the several preceding decades, and had EE not consented to the mark in 1977.

Defendants will also suffer "prejudice at trial due to loss of evidence or memory of witnesses…."  *Bridgestone*, 245 F.3d at 1362.  The alleged abandonment of the EMERSON QUIET KOOL mark, a key component of all of EE's claims, stems from a supposed absence of sales of EMERSON QUIET KOOL products leading up to the 2008 bankruptcy of Fedders.  Defendants do not have access to records from Fedders to prove whether sales actually ceased in the mid-2000s (tellingly, EE has not even tried to obtain this information, even though it is necessary to prove its case).  Similarly, Defendants have no access to records regarding the 1977

24

and 1987 disputes between EE and the owners of the EMERSON QUIET KOOL mark and any

witnesses to such disputes may not even be alive, preventing Defendants from accessing

statements made by EE at that time regarding the scope of all relevant marks.  Key among these

statements would be why EE believed it was acceptable then for someone else to register

EMERSON QUIET KOOL on air conditioners but has the opposite belief now.



Because EE's inexcusable delays caused

*both* economic and evidentiary prejudice to Defendants, its claims should be denied.

     *b.  ER's Inexcusable Delay*

ER has similarly known for decades about use of the EMERSON QUIET KOOL mark on

air conditioners and dehumidifiers.  Starting in the mid-1960s, the Emerson Radio marks were

owned by the same company that sold EMERSON QUIET KOOL products.  D.I. 30 in C.A. No.

20-cv-01652, ¶ 23.

Exhibit A, at ER26457.  The

EMERSON QUIET KOOL marks were sold off by NUE in 1983 (Exhibit D), a year *before* the

company that became ER gained ownership of the ER marks (Exhibit B).  ER knew about the

EMERSON QUIET KOOL mark for decades before the alleged abandonment, far exceeding the

six-year period applied under a New Jersey claim.  *Fife & Drum*, 2019 U.S. Dist. LEXIS

190582, at *21.  Again, under *Champion Products*, that alone is sufficient to prove Defendants' defense and shift the burden onto ER.

However, like with EE, Defendants suffered prejudice sufficient to affirmatively prove the element.  Economic prejudice is clear through Defendants' purchase of the EMERSON QUIET KOOL business for ███████, which they would not have done had ER timely made its objection to the EMERSON QUIET KOOL mark in any of the several preceding decades.

Defendants will also suffer "prejudice at trial due to loss of evidence or memory of witnesses…." *Bridgestone*, 245 F.3d at 1362.  Defendants do not have access to records from Fedders to prove whether sales actually ceased in the mid-2000s (like EE, ER has not even tried to obtain this information). ████████████████████████████████████████
████████████████████████████████████████████████.

Even ER's own employees who had personal knowledge of the various agreements relevant to this case are retired, deceased, or both. ███████████████████████
████████████████████████████████████████████████.
Defendants simply lack access to any witnesses who could have testified to the period in which their mark was supposedly abandoned.  Because ER's inexcusable delays caused *both* economic and evidentiary prejudice to Defendants, its claims should be barred.

### D.  Defendants Should be Awarded Summary Judgment on Emerson Radio's Anticybersquatting Claim

Count IV in ER's Amended Complaint is for an alleged violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d).  D.I. 30 in C.A. No. 20-cv-01652, at 34-36.  That Act requires ER to prove, among other elements, that Defendants operated a domain name with "a bad faith intent to profit from" the trademark found within the domain.  15 U.S.C. § 1125(d)(1)(A).  There is no evidence of such bad faith.  Instead, the only available

evidence shows that Defendants believed their use of the EMERSON QUIET KOOL mark was sanctioned by both Plaintiffs.  Mr. Xiao, President of Home Easy, testified that in his previous role as President of Midea North America, he was responsible for sales of various products, such as refrigerators, air conditioners, dishwashers, and washing machines.  Exhibit W, at 16:6-17:25.  In that role, he worked with Emerson Radio since 2006.  *Id.*, at 17:14-15.  During his years arranging for Midea to manufacture products for Emerson Radio, Emerson Radio repeatedly informed Mr. Xiao that "Emerson Radio has no right to make any AC unit."  *Id.*, at 18:11-21:20.  Mr. Xiao also repeatedly testified that Defendants asked their attorneys to review the history and chain of title of the EMERSON QUIET KOOL mark and relied on the attorneys' advice to use the mark.  Exhibit TT, at 169:22-170:9; 190:16-21; 191:1-14; 192:3-19; 193:25-194:7; 197:17-198:4; 198:10-16; 207:3-11; 208:16-209:20; 223:23-224:19.  In addition, the Trademark Purchase & Sale Agreement under which Defendants acquired the mark expressly referenced and assigned the 2009 and 2011 Consent Agreements with Emerson Electric, lending further credibility to Defendants' belief their use was legitimate.  Exhibit S, at 1.

Thus, the testimony and documents show that Defendants not only believed they were purchasing a trademark which a decades-long history that included statements from both Plaintiffs that portable air conditioners were a category unto themselves that neither Plaintiff had rights to, but they even cleared their actions with attorneys.  Plaintiffs have no evidence to the contrary and thus summary judgment should be granted to Defendants on ER's anticybersquatting claim due to a lack of evidence of bad faith.

### E. Defendants Should be Awarded Summary Judgment on Emerson Radio's Dilution Claim

Count VI of Emerson Radio's Amended Complaint is for trademark dilution under New Jersey statute § 56:13-20.  "Dilution claims under New Jersey law are subject to the same

considerations as federal dilution claims." *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp.

2d 273, 294 (D.N.J. 2006).  "In order to establish a federal dilution claim, a plaintiff must show:

> …,
>
> (3) defendant's use began after the plaintiff's mark became famous; and
>
> (4) defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services."

*Lingo v. Lingo*, 785 F. Supp. 2d 443, 455 (D. Del. 2011).

Emerson Radio cannot simultaneously prove elements three and four.  ER's allegations are based on the idea that the EMERSON QUIET KOOL mark was abandoned and then newly used in May 2017.  However, as shown above, the EMERSON QUIET KOOL mark was ***not*** abandoned and dates to 1949.  There is no evidence in the record through which Emerson Radio can show its marks became famous before 1949.  Emerson Radio thus fails the third element.

However, if the EMERSON QUIET KOOL mark was abandoned and then used anew in 2017, there is no causation between this new use in 2017 and Emerson Radio's supposed dilution. ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████  Exhibit UU, at 13-14.  The expert's figures confirm a long-running decline in ER's net revenues, which were $207 million in fiscal year 2010 (Exhibit VV, at 19) and $320 million in fiscal year 2005 (Exhibit WW, at 41).  Thus, if the mark was abandoned, or if Defendants are for some other reason not permitted to claim the benefit of their predecessors' use of the mark, Emerson Radio cannot prove that ***Defendants*** caused any loss in value of Emerson Radio's brand, the fourth factor in the analysis.  ER's value dropped by almost 90% before Defendants' operations began.  Thus, some other force is responsible for any dilution of the Emerson Radio marks.

**F.  Defendants Are Entitled to Summary Judgment on EE's Cancellation Claim**

EE seeks cancellation of Defendants' U.S. Trademark Reg. No. 4,688,893, alleging the mark was abandoned and the new registration is confusing with EE's own registrations.  D.I. 1 in C.A. No. 17-cv-01846.  The '893 Registration is for the mark EMERSON QUIET KOOL in the field of portable compact residential window and wall room air conditioning units.  EE's claims fail due to its admissions and consent given to the EMERSON QUIET KOOL mark over the past five decades.  These acts of consent each show there is no valid claim of confusion between EE's marks and the '893 Registration, regardless of any claim of abandonment.



In 1977, Exhibit RR, ¶ 4.  It cannot reasonably be disputed that Defendants are the successors in business of NUE, as demonstrated by the chain of assignments of the EMERSON QUIET KOOL mark and associated goodwill. Exhibit J, at 6-8.  However, even if there could be some doubt in that respect, the 1977 Agreement still acts as an admission by EE that the EMERSON QUIET KOOL word mark, which is the subject of the '893 Registration, ". Exhibit RR, p. 1.  Second, EE explicitly consented to the '893 Registration in the 2011 Consent Agreement.  Exhibit Q, ¶ 5.  EE now seeks to take back both explicit grants of consent.

EE argues neither of these consents are valid because, allegedly, Defendants have used the EMERSON QUIET KOOL mark in a specific configuration, including font sizes and colors,

that is particularly confusing with respect to certain EMERSON marks.  That is irrelevant to this issue; the '893 Registration is merely for the words EMERSON QUIET KOOL, and "consists of standard characters *without claim to any particular font, style, size, or color*."  Exhibit P.  Even if Defendants used the EMERSON QUIET KOOL mark in some particular font/color arrangement that is especially confusing with EE's marks (which Defendants do not concede), the '893 Registration does not claim any color or font.  Thus, based on EE's prior admissions and consent, there is no dispute of fact to sustain EE's claim to cancel the '893 Registration.

## IV.    CONCLUSION

For the reasons stated above, Defendants respectfully request the Court enter summary judgment in their favor on all Counts in both cases.


Dated: July 15, 2021

Of Counsel:

Keith A. Jones (*pro hac vice*)
Panitch Schwarze Belisario & Nadel LLP
Two Commerce Square
2001 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: (215) 965-1330
kjones@panitchlaw.com

PANITCH SCHWARZE BELISARIO & NADEL, LLP

By: */s/ John D. Simmons*
    John D. Simmons (Bar No. 5996)
    Dennis J. Butler (Bar No. 5981)
    Wells Fargo Tower
    2200 Concord Pike, Suite 201
    Wilmington, DE 19803
    Telephone: (302) 394-6030
    jsimmons@panitchlaw.com
    dbutler@panitchlaw.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 15, 2021, a true and correct copy of the foregoing BRIEF IN

SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT was served upon the

following via ECF notification:

George D. Moustakas
Lisa M. DuRoss
HARNESS, DICKEY & PIERCE PLC
5445 Corporate Drive, Suite 200
Troy, MI  48098
248-641-1600
gdmoustakas@hdp.com
lduross@hdp.com

Joel R. Samuels
HARNESS, DICKEY & PIERCE PLC
7700 Bonhomme Ave., Suite 400
Clayton, MO 63105
314-726-7509
jsamuels@hdp.com

Adam W. Poff (No. 3990)
Robert M. Vrana (No. 5666)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
302-571-6600
apoff@ycst.com
rvrana@ycst.com

*Counsel for Emerson Electric Company*

Mark H. Anania
STEVENS & LEE
669 River Drive, Suite 201
Elmwood Park, NJ 07407
201-857-6769
mark.anania@stevenslee.com

Lisa T. Simpson
ORRICK HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street,
New York, NY 10019-6142
212-506-3767
lsimpson@orrick.com

Stacey A. Scrivani
Stevens & Lee
919 North Market Street, Suite 1300
Wilmington, DE 19801
302-425-3306
sasc@stevenslee.com

*Counsel for Emerson Radio Corp.*

*/s/ John D. Simmons*
John D. Simmons